DENNIS JACOBS, Circuit Judge.
Three employees of General Electric Company (“GE”) conducted a multi-year scheme to fix below-market rates on interest paid by GE to municipalities. When municipalities receive proceeds of tax-exempt bond issues, they invest those proceeds (with GE and others) until such time as the funds become needed for the underlying capital projects. To prevent abuse of municipal bonds for pure arbitrage, the Internal Revenue Code and Treasury regulations require'a municipality to rebate to the Treasury any excess over the municipal bond rate. To guarantee a market rate of interest on these investments, municipalities are required to use competitive bidding. The conspiracy between GE employees and brokers depressed the interest rate on the guaranteed investment contracts paid by unindicted co-conspirator GE; each instance cheated either the municipalities or the Treasury (or both).
Steven Goldberg, Peter Grimm, and Dominick Carollo (collectively, “Defendants”) were tried and convicted in the United States District Court for the Southern District of New York (Baer, J.) of violating the general federal conspiracy statute, 18 U.S.C. § 371. Goldberg was sentenced principally to four years in prison, Grimm and Carollo to three. They appeal the judgments of conviction on the ground (inter alia) that the indictment is barred by the applicable statutes of limitations. ‘ The district court held that the statute of limitations continued to run during the period when GE paid the (depressed) interest to the municipalities, and that the interest payments could constitute overt acts. We conclude that those payments do not constitute overt acts in furtherance of the conspiracy.
I
Under the Internal Revenue Code (“Tax Code”), interest payments on qualifying municipal bonds are exempt from federal income tax. See I.R.C. § 103(a). Often, municipal issuers (“issuers”) do not expend the proceeds immediately because the projects financed by the issue may take years to construct. To generate additional revenue before the funds are depleted, an issuer may invest in a guaranteed investment agreement or contract (“GIC”) provided by a financial institution with a high credit rating (“provider”). GICs typically require periodic interest payments. Although GICs have a fixed maturity date, the issuer can usually draw *500 down the principal — and thus terminate the GIC — at any time.[1]
To prevent arbitrage, the Tax Code limits the return that issuers can generate through GICs. See I.R.C. § 148. In general, any return in excess of the interest on the bonds must be paid to the Treasury. I.R.C. § 148(f). An issuer thereby lacks incentive to maximize interest on a GIC above a rate that equals or exceeds the interest rate paid on the bonds, and the arbitrage opportunities for a provider are obvious.
To prevent such abuses, Treasury regulations require issuers to determine for each GIC the fair market value, calculated as a function of the market interest rate, on the date of purchase. Treas. Reg. § 1.148-5(d). Market value is not easily determinable, however, because GICs are not regularly traded. So the Treasury regulations require as a safe harbor a competitive bidding process that, if followed, establishes the fair market value of the GIC for tax purposes. Treas. Reg. § 1.148 — 5(d)(6)(iii). Issuers hire third party brokers to solicit closed bids from at least three providers; each provider offers an interest rate without knowing the rates offered by the other bidders; and the winning bidder certifies in writing that it had no prior opportunity to review the bids of other providers.
In 1999, Carollo, Goldberg, and Grimm worked for the unit of GE that served as a GIC provider. In 2001, Goldberg left GE and took a position at another provider, Financial Security Assurance, Inc. (“FSA”). Between August 1999 and May 2004, the Defendants (on behalf of their employers GE and FSA) agreed to pay kickbacks to three brokers-Chambers, Dunhill, Rubin & Co. (“CDR”); Investment Management Advisory Group, Inc. (“IMAGE”); and UBS PaineWebber, Inc. (“UBS”) — and the brokers obliged by rigging the bidding process in several ways. In some instances, the broker told a Defendant what others were bidding, which allowed the Defendant to lower an initial bid if it significantly exceeded the second-place bid, or to raise the bid to a level just high enough to win the contract.[2] In another case, a broker agreed to keep competitive bidders off the bid list, which allowed the Defendant to prevail with a low bid. And sometimes a broker would rig an auction by asking certain providers to submit intentionally losing bids. Depending on the fraudulent bid rate, the municipal bond rate, and the market interest rate, each deal defrauded the municipality, the Treasury, or both.
On July 27, 2010,, a federal .grand jury returned an indictment (“Initial Indictment”) charging Carollo, Goldberg, and Grimm with ten conspiracies. A May 81, 2011 superseding indictment (“Superseding Indictment”) narrowed the charges. Six counts charged a two-object conspiracy in violation of 18 U.S.C. § 371 to defraud (i) the issuers of money and property through the use of an interstate wire, in violation of 18 U.S.C. § 1343, and (ii) the United States. Count Seven charged Car-ollo and Goldberg with a substantive wire fraud scheme in violation of 18 U.S.C. § 1343.
Defendants moved to dismiss the Superseding Indictment, arguing that the conspiracy and fraud charges were barred by the statute of limitations. In an August *501 2011 order, the district court dismissed the wire fraud charge because the government had not alleged any activity within the five-year limitations period, but declined to dismiss the conspiracy charges, holding that the alleged conspiracies continued as long as unindicted co-conspirators GE and FSA made interest payments on the GICs. United States v. Carollo, et al., No. 10-cr-654 (HB), 2011 WL 3875322 at *2-3 (S.D.N.Y. Aug. 25, 2011).
After a three-week trial and three days of deliberations, a jury convicted Goldberg on four counts, Grimm on three counts, and Carollo on two counts. The district court denied Defendants’ post-verdict motions, reiterating that the “conspiracy lasts ,.. so long as the conspirators obtain an economic benefit through artificially suppressed payments.” United States v. Carollo, et al., No. 10-cr-654 (HB), ECF No. 285 at 11 (S.D.N.Y. Nov. 20, 2012).
II
The applicable statutes of limitations are: five years for general conspiracy, see 18 U.S.C. § 3282(a), and six years for conspiracy to defraud the United States by violating the internal revenue laws, see 26 U.S.C. - § 6531(1).[3] The Initial Indictment was returned on July 27, 2010. To satisfy the statute of limitations for general conspiracy, the government must establish that a conspirator knowingly committed at least one overt act in furtherance after July 27, 2005; to satisfy the statute of limitations for a fraud on the United States, the government must establish at least one overt act in furtherance after July 27, 2004. See United States v. Salmonese, 352 F.3d 608, 614 (2d Cir.2003) (citing Grunewald v. United States, 353 U.S. 391, 396-97, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957)).
Of the fifty-five overt acts alleged in the Superseding Indictment, the .only ones that involved conduct after July 27, 2004 were the periodic interest payments made by providers to issuers pursuant to the GICs: “On numerous occasions, [provider] ... made payments to municipal issuers via interstate wire transfer at artificially determined or suppressed rates.” Superseding Indictment ¶¶ 22(f) (Count One); 30(f) (Count Two); 38(f) (Count Three); 47(f) (Count Four); 57(f) (Count Five); 64(f) (Count Six).[4] The Defendants argue *502 that such interest payments cannot serve as overt acts because the routine payments were scheduled to continue for years (if not decades) after the GICs were awarded and after all concerted conduct had ended. We review this legal claim de novo. Sal-monese, 352 F.3d at 614.
“ ‘[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy.’ ” Id. (quoting Grunewald, 353 U.S. at 397, 77 S.Ct. 963). Here, the alleged purposes of the conspiracies were (1) to “deprive municipal issuers of money by causing them to award investment agreements and other municipal finance contracts at artificially determined or suppressed rates, and to deprive the municipal issuers of the property right to control their assets by causing them to make economic decisions based on false and misleading information”; and (2) to “defraud the United States ... and the IRS by impeding ... [the] collection of revenue due ... from municipal issuers.” Superseding Indictment ¶¶ 19-20.
In United States v. Salmonese, we held that a conspirator’s receipt of anticipated profits from the sale of stripped warrants constituted an “overt act in furtherance of an economically-motivated conspiracy.” 352 F.3d at 616. We explained that, “where a conspiracy’s purpose is economic enrichment, the jointly undertaken scheme continues through the conspirators’ receipt of ‘their anticipated economic benefits.’ ” Id. at 615 (citing United States v. Mennuti, 679 F.2d 1032, 1035 (2d Cir.1982)). The government relies on that passage to support its view that each successive payment of interest by an unindicted coconspirator is another overt act. Salmonese gets the government only so far.
Salmonese followed the analysis set out in United States v. Doherty, 867 F.2d 47 (1st Cir.1989), and that analysis defeats the government’s argument in the circumstances of the current appeal. In Doherty, police officers conspired to obtain copies of promotional exams, and thereby increased their salary payments, which continued for years after they were increased by means of the fraud. Doherty nevertheless held that the continuing receipt of the ill-gotten salaries did not constitute overt acts, and therefore did not re-start the limitations period. Following Doherty, Salmonese reasoned that a conspiracy ends notwithstanding the receipt of anticipated profits “ ‘where [ ] the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions ... and there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place.’ ” Salmonese, 352 F.3d at 616 (citing Doherty, 867 F.2d at 61) (emphasis in original). Conversely, “ ‘payoffs’ could reasonably be viewed as part of a conspiracy where their receipt ‘consists of one action, or a handful of actions, taking place over a limited period of time, or where some evidence exists that the special dangers attendant to conspiracies ... remain present until the payoff is received.’ ” Id. (citing Doherty, 867 F.2d at 61).
In Salmonese, the sales of the stripped warrants were counted as overt acts because they were completed within ten weeks of the public offering and were “hardly ‘indefinite’ in number or ‘lengthy’ *503 in duration.” Id. That analysis here commands the opposite result.
Doherty and Salmonese list features to describe serial payments that do not constitute overt acts: lengthy, indefinite, ordinary, typically noncriminal and unilateral. The list is descriptive rather than exclusive; but generally, overt acts have ended when the conspiracy has completed its influence on an otherwise legitimate course of common dealing that remains ongoing for a prolonged time, without measures of concealment, adjustment or any other corrupt intervention by any conspirator.
The GIC payments here fit that description in every particular. Payments of interest on a GIC are ordinary commercial obligations, made pursuant to a common form of commercial arrangement; they are noncriminal in themselves; they are'made unilaterally by a single person or entity; and they are made indefinitely, over a long time, typically up to 20 years or more. Some are still being-paid. And since the government adduced no evidence of overt acts after July 27, 2004 other than the interest payments, “there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place.” Salmonese, 352 F.3d at 616 (citing Doherty, 867 F.2d at 61).
The government argues that the interest payments are not “indefinite” because each GIC has a maturity date and prescribes the number of payments to be made. The government’s position must be that a conspiracy continues so long as a stream of anticipated payments contains an element of profit. But that proves too much. A conspiracy to corrupt the rent payable on a 99-year ground lease would, under the government’s theory, prolong the overt acts until long after any conspirator or co-conspirator was left to profit, or to plot.
“Indefinite” cannot mean “without end.” Even in Doherty, the salary payments lasted only as long as the officers’ employment: Payments can be “indefinite” either in' the sense that they are of undetermined number or in the sense that they are prolonged beyond the near future. The GIC payments are indefinite in both senses.
The interest payments continue indefinitely in the sense that they are prolonged. And the number of payments is not fixed because they end when and if:
• the issuer demands the return of all of the principal to finance the capital project;
• the GIC is assigned (with the prior written consent of the issuer); or
• the provider’s credit rating falls below a specified level, at which point the issuer can terminate the GIC and withdraw the funds for any purpose, including reinvestment.
In any event, when anticipated economic benefit continues, in a regular and ordinary course, well beyond the period “when the unique threats to society posed by a conspiracy are present,” Doherty, 867 F.2d at 62, the advantageous interest payment is the result of a completed conspiracy, and is not in furtherance of one that is ongoing.[5] As the Supreme Court has explained:
Though the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one. Continuity of action to produce the unlawful result, or ... 'continuous co-operation of *504 the conspirators to keep it up’ is necessary.
Fiswick v. United States, 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196 (1946) (citations omitted) (quoting United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168 (1910)). The stream of GIC interest payments does not raise the underlying concern of concerted action,.and therefore is not a continuous action that prolongs the life of the conspiracy.[6]
CONCLUSION
For the foregoing reasons, we hold that the government did not allege overt acts within the limitations period. Accordingly, we reverse the judgments of conviction, and remand to the district court for dismissal of the indictment.
Judge KEARSE dissents in a separate opinion.

. There are sometimes limitations on the number of withdrawals that the issuer can make in a given period, but there is no limit on the size of withdrawals, so long as the funds are used for the underlying capital projects.

. While this second practice of raising a bid does not, at first blush, appear to hurt the municipality, in practice it does — the corrupt bidder can intentionally bid low, knowing that the bid can later be raised if need be.

. “[A] conspiracy charge require[s] (a) an agreement between two or more persons to commit [] fraud and (b) an overt act by at least one of the participants in furtherance of that agreement. See 18 U.S.C. § 371.” United States v. Archer, 671 F.3d 149, 154 n. 1 (2d Cir.2011).

. Six other alleged overt acts (one per count) referenced specific interest payments. Superseding Indictment ¶¶ 22(g)(iii) (Count One) ("Beginning in approximately July 2004, Provider B made scheduled interest payments via interstate wire transfer to-the state housing agency at a rate GRIMM caused to be artificially determined and suppressed, which payments continued until approximately November 1, 2005”); 30(g)(iii) (Count Two) ("Provider B has made scheduled interest payments via interstate wire transmissions to the state housing and finance association at artificially determined and suppressed rates, including a payment of approximately $55,652.43 on or about June 30, 2006.”); 38(g)(iii) (Count Three) ("Beginning in approximately late 2000, via interstate wire transfer, Provider B made semi-annual interest payments to a state environmental improvement and energy authority at rates that were artificially determined and suppressed, including a payment on one of the funds of approximately $35,361.20 on or about June 30, 2006.”); 47(g)(iii) (Count Four) ("Provider B made scheduled payments via interstate wire transfer to a state educational assistance foundation at artificially determined and suppressed rates, including a payment of approximately $43,442.04 on or about November 1, 2006.”); 57(g)(iv) (Count Five) (“Beginning approximately in May 2003, Provider A made semi-annual interest payments via interstate wire to the municipal port facility at a rate that was artificially determined, which payments continued until at least October *502 2006.”); 64(g)(iii) (Count Six) ("On or about April 14, 2006, Provider A made, via interstate wire transfer, a payment of principal and interest of approximately $2,761,041.96 to a state educational facilities authority, which payment was artificially determined and suppressed.”).

. The dissent assumes that because GE was (necessarily) found to be a co-conspirator, its acts over the full term of the contract were acts performed as a co-conspirator and were therefore “overt acts.” This argument assumes its own conclusion: characterizing GE’s contractual performance over decades as "overt acts” assumes that the conspiracy continued indefinitely over that time notwithstanding that in every other respect it had'run its course.

. As in Doherty, "the cases the government has cited ... [are] consistent with this approach." Doherty, 867 F.2d at 62. 'Nearly every case involved either continued concerted action or a few payments over a short time period. See, e.g., Salmonese, 352 F.3d at 614 (just over a handful of sales over a ten-week period); United States v. Mennuti, 679 F.2d 1032 (2d Cir.1982) (single purchase of a home); United States v. A-A-A Elec. Co., 788 F.2d 242 (4th Cir.1986) (payoffs to co-conspirators continued after award of contract); United States v. Girard, 744 F.2d 1170 (5th Cir.1984) (last payment on one-year government contract made fewer than three months after final payoff to co-conspirators); United States v. Walker, 653 F.2d 1343 (9th Cir.1981) (conspirators continued to divide profits from scheme on a yearly basis).