**UNITED STATES, Appellee,**

v.

**Michael J. FITZPATRICK,**
**Defendant, Appellant.**

**No. 89–1551.**

United States Court of Appeals,
First Circuit.

Heard Nov. 8, 1989.
Decided Dec. 27, 1989.

Before BOWNES and BREYER, Circuit Judges, and VAN GRAAFEILAND, Senior Circuit Judge *.

BOWNES, Circuit Judge.

This is an appeal by defendant-appellant Michael J. Fitzpatrick from a conviction by jury of a substantive violation of the Travel Act, interstate travel in aid of bribery, 18 U.S.C. § 1952, and conspiracy to violate the Travel Act, 18 U.S.C. § 371. Defendant's indictment for violations of the Travel Act was consolidated for trial with a subsequent indictment for income tax evasion and conspiracy to obstruct the government in its computation and assessment of defendant's income taxes. This appeal concerns only the Travel Act convictions. Defendant raises two issues: that the assistant United States attorney engaged in misconduct during the trial that prejudiced the defendant and prevented him from getting a fair trial, and that the Travel Act indictment, which issued October 1, 1987, was barred by the five year statute of limitations, 18 U.S.C. § 3282.

Our careful review of the record reveals no misconduct by the assistant United States attorney that would require a new trial. In fact, defendant's allegations of misconduct are either without support in the record or the type of misconduct that exists only in the eyes of the beholder. We, therefore, confine our discussion to the statute of limitations issue.

## I. FACTS

A. *Background*

We state the facts, as we must, in the light most favorable to the government. *United States v. Bruckman*, 874 F.2d 57, 59 (1st Cir.1989); *United States v. Drougas*, 748 F.2d 8, 15 (1st Cir.1984).

Appellant Michael J. Fitzpatrick was a loan officer for the Bank of New York (Bank). His responsibilities included servicing construction loans for projects in the Newport, Rhode Island area. In that capacity, Fitzpatrick was the loan officer in

Daniel R. Marlowe, for defendant, appellant.

Margaret E. Curran, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty. for the Dist. of R.I., Providence, R.I., was on brief for appellee.

* Of the Second Circuit sitting by designation.

charge of a construction loan for a residential condominium to be built and marketed by a limited partnership known as Brenton's Cove Development Company (Brenton's Cove). The general partners of Brenton's Cove were a real estate broker, Herbert L. Finley and a real estate consultant, Radcliffe L. Romeyn, Jr. After becoming acquainted with Fitzpatrick through the Brenton's Cove project, Finley and Romeyn sought and obtained his approval for two other construction loans as well as modifications to the terms of those loans. These are the loans that spawned the Travel Act violations.

The two loans were for "condominium hotels"[1] in Newport, Rhode Island. Landing Development Company (Landing), a limited partnership formed in January, 1980, was to build "Inn on the Harbor." Finley, Romeyn, and William R. Wing were its general partners. Long Wharf Development Company (Long Wharf), a general partnership formed in August, 1980, was to build "Inn on Long Wharf." Finley, Romeyn, Wing, and Timothy M. Dwyer were its general partners.

Early in 1981, Finley and Romeyn approached Fitzpatrick with a request for a package construction loan from the Bank for the two projects. In March they received a commitment letter from the Bank for $6,170,000 in construction funds for Landing and Long Wharf. The two companies were to be jointly and severally liable on the loan and the money was to be advanced to the two companies collectively. The construction was to proceed in three phases: Landing was responsible for Inn on the Harbor (Phases I and II); Long Wharf was responsible for Inn on Long Wharf (Phase III). The construction loan from the Bank to Landing for $3,055,000 closed in New York on April 16, 1981. The loan to Long Wharf was delayed by problems in getting the necessary building permit.

### B. *Travel Act—Conspiracy Evidence*

In the spring of 1981 Fitzpatrick made it clear to Finley that he wanted a J–24 sail-boat. Finley agreed to get him one. On March 25, 1981, Romeyn made out a check for $1,000 to Pirate's Cove Marina as a down payment on a J–24. On April 15, 1981, a sales contract was entered into between Pirate's Cove and Romeyn for a J–24. On June 10, 1981, Romeyn issued a check for $16,253.00 to Pirate's Cove; this was the balance due on the purchase of the J–24. A short time later, Fitzpatrick picked up the boat at Portsmouth, Rhode Island and took it to his home on City Island, New York. Finley testified that the J–24 was given to defendant in the hope that it would result in favorable financial arrangements for future projects.

In the summer of 1981, Finley and Romeyn were approached by Perry Harris, an old friend of Finley and a limited partner in the Brenton's Cove project. Harris wanted to buy the Landing and the Long Wharf properties and convert the planned condominium hotels into time-share resorts. He proposed forming a limited partnership called Inn Group Associates (Inn Group) to buy the properties. The principals of Landing and Long Wharf were to have fifty percent ownership of Inn Group. Finley and Romeyn testified that a lot more money could be made with time-shares; a unit which would have sold to one person for $100,000 under the original plan could be sold as a time-share to 25 people for $400,000. For the time-share conversion to go through, the Bank would have to approve the sale of the Landing and Long Wharf properties and approve the assumption of the mortgage and commitments by Inn Group. In addition, the Bank would have to modify the repayment terms of the existing construction loan to Landing. Landing's loan called for a payback to the Bank on the basis of roughly 95 percent of the net proceeds from the sale of each condominium hotel unit. When one unit was sold, the Bank was to receive what it was owed on that unit. Under the time-share arrangement, there would have to be several sales of the unit before Inn Group would have enough proceeds to pay the Bank what was owed on the unit.

---

**1.** This term was used by Finley and Romeyn in their testimony. It was not further explained.

Finley spoke to Fitzpatrick about the proposed sale of the two properties and their conversion into time-shares. Fitzpatrick's initial response was that the Bank would not agree to the sale and conversion. Finley persisted, however, and persuaded Fitzpatrick to agree to the conversion by cutting him in on the profits.

James Hamilton, a former Bank employee who had been the vice president of construction loans and Fitzpatrick's supervisor at the time, testified that any major modification to an existing loan had to have the approval of the Bank's credit committee. He also testified that a Bank attorney and the loan officer should be present at any closing; the attorney's presence was to assure compliance with the loan documents. On August 3, 1982, a memo from the Bank's senior executive vice president stated that the actual loan closing documents must comport with what the credit committee approved and that a group head would have to certify such compliance on the closing of all loans. Hamilton was a group head. He did not become aware of the modified terms in the Landing and Long Wharf loans authorized by Fitzpatrick until November or December of 1982, long after the fact.

On December 17, 1981, Inn Group was created for the purpose of acquiring the Landing and Long Wharf properties and converting them to time-shares. The purchase price for both properties was $10,-000,000. Finley, Romeyn, Wing, and Dwyer were made 50 percent owners and general partners of Inn Group. Upon the execution of the purchase and sale agreement, a $1,000,000 nonrefundable deposit was paid by Inn Group to Landing. Within a day or two following Landing's receipt of that deposit, Finley and Romeyn each withdrew $250,000 from that account. Fitzpatrick received a pay-off of $200,000. He instructed Finley to make the payments to the order of R & S Corp., a Panamanian company that Fitzpatrick had set up to hide income from the IRS. Finley relayed that instruction to Romeyn, and on December 18, 1981, Romeyn wrote a Landing check

payable to R & S in the amount of $50,000. On January 5, 1982, Romeyn wrote another Landing check payable to R & S in the amount of $150,000.

On August 19, 1982, the closing on the sale of Inn on the Harbor from Landing to Inn Group took place in Newport. Fitzpatrick was present, but there was no attorney representing the Bank. Acting on behalf of the Bank, Fitzpatrick assented to the sale from Landing to Inn Group of the property and to Landing's assignment of the mortgage and the other documents to Inn Group. He executed, on behalf of the Bank, a release agreement which restructured the repayment terms of the Landing loan and also signed an assignment and estoppel agreement.

The closing on the loan for Long Wharf had not yet taken place. Long Wharf had not satisfied the requirements of the Bank's commitment letter that it obtain approval from Coastal Resources,[2] and a building permit, prior to closing. On September 16, 1982, Romeyn, Finley, and Fitzpatrick met at Fitzpatrick's home on City Island, New York and reviewed documents for the Long Wharf loan. There was no attorney present for the Bank. Finley and Romeyn signed the construction loan agreement between Long Wharf and the Bank. Despite the fact that Coastal Resources had not approved construction and a building permit had not been obtained by Long Wharf, Fitzpatrick approved the loan for the Bank.

At some point during this meeting, Fitzpatrick requested that Romeyn send a construction crew from Rhode Island to work on his house on City Island. Finley testified that this work was done for business purposes. Romeyn testified that the home improvements were a quid pro quo for Fitzpatrick's bypassing the requirements of the Bank's commitment letter and approving the loan. Renovations to Fitzpatrick's home began in October of 1982. Romeyn drew four checks on the Landing account between October 6 and November 10, 1982, to pay for material and labor. One crew was sent from Rhode Island to New York

2. Coastal Resources is a state environmental planning agency.

on the second weekend in October to build a widow's watch and install a Jacuzzi at Fitzpatrick's City Island home. Shortly thereafter, a carpenter spent two and a half weeks on City Island extending a deck on Fitzpatrick's home. The evidence was that the renovations done at Fitzpatrick's home cost at least $6,086.81.

On or around September 17, 1982, Fitzpatrick told Finley to send him a check for $50,000 and to leave the payee space blank. Finley relayed that instruction to Romeyn who drew a Landing check with no payee, dated September 27, 1982, in the amount of $50,000. Finley then mailed the check to Fitzpatrick. Fitzpatrick filled in the payee space with the words, "Pares Y Nones," (Spanish for evens and odds). The check was deposited in a Panamanian account on October 1, 1982. On October 4, 1982, it cleared Bankers Trust Company, New York. On October 5, 1982, it cleared the Federal Reserve Bank in Boston and the Newport National Old Colony Bank. Finley testified that the check was given to Fitzpatrick for authorizing the loan modifications and the sale of Landing and Long Wharf to Inn Group.[3]

## II. THE STATUTE OF LIMITATIONS

The indictment was returned on October 1, 1987. The question, therefore, is whether the offenses charged, interstate travel in aid of bribery, a substantive Travel Act violation, and conspiracy to violate the Travel Act, were committed within five years of the date of the indictment. We start our analysis with the pertinent provisions of the Travel Act:

> (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
>
> > (1) distribute the proceeds of any unlawful activity; or
>
> . . . . .
>
> > (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment,

or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

> (b) As used in this section "unlawful activity" means ... (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States....

18 U.S.C. § 1952.

In *Perrin v. United States*, 444 U.S. 37, 50, 100 S.Ct. 311, 318, 62 L.Ed.2d 199 (1979), the Court held: "In defining an 'unlawful activity,' Congress has clearly stated its intention to include violations of state as well as federal bribery law." There is no question here that the payments to defendant implicated both Rhode Island and New York bribery offenses. We have held:

> To establish a violation of the Travel Act, 18 U.S.C. § 1952, the government must prove: (1) interstate travel or the use of an interstate facility; (2) with the intent to distribute the proceeds of or otherwise promote, manage, establish, carry on, or facilitate an unlawful activity; (3) followed by performance, or attempted performance of acts in furtherance of the unlawful activity.

*United States v. Arruda*, 715 F.2d 671, 681 (1st Cir.1983).

We now turn to the post-October 1, 1982, evidence to determine if the statute of limitations is a bar to defendant's prosecution on the substantive count of the indictment. On September 1, 1982, defendant requested his fellow conspirators that a construction crew be sent from Rhode Island to New York to work on his house. The work was in effect the payment of a bribe to defendant for approving a loan that did not meet the Bank's requirements. All of the work was done after October 1, 1982. The labor was carried out by men who travelled from Rhode Island to New York for the express purpose of making renovations and repairs

---

**3.** Fitzpatrick did not report as income the gift of the J–24 sailboat, any of the monies he received via the checks, or the cost of the renovations to his home on his income tax returns for 1981 and 1982. This was the basis for the tax evasion indictment.

to defendant's home. The last check for materials and labor was dated November 10, 1982. This travel was done at the express request of defendant. We think that the work on defendant's home continued as Travel Act violation until the work was finished and paid for, November 10, 1982.

■ It is well established that prearranged use of the mails for sending checks to a defendant comes within the proscription of the Travel Act. *United States v. Hathaway*, 534 F.2d 386, 397–98 (1st Cir.), *cert. denied*, 429 U.S. 819, 96 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Peskin*, 527 F.2d 71, 77 (7th Cir.1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). If instead of having the work done, defendant had received a check mailed from Rhode Island to New York for the amount it cost, $6,086.81, there is no doubt that this would have been a violation of the Travel Act. We see no reason why interstate travel by others that results in a violation of state bribery statutes should not give rise to a substantive violation of the Travel Act by the one that ordered the travel. This situation is akin to the cases adverted to in *Rewis v. United States*, 401 U.S. 808, 813, 91 S.Ct. 1056, 1060, 28 L.Ed.2d 493 (1971):

> Still, there are cases in which federal courts have correctly applied § 1952 to those individuals whose agents or employees cross state lines in furtherance of illegal activity, *see, e.g., United States v. Chambers*, 382 F.2d 910, 913–914 (CA6 1967); *United States v. Barrow*, 363 F.2d 62, 64–65 (CA3 1966), *cert. denied*, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967); *United States v. Zizzo*, 338 F.2d 577, 580 (CA7 1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435 (1965).

*See* discussion of *Rewis* in *United States v. Hathaway*, 534 F.2d at 397–98.

We hold that the work done on defendant's house after October 1, 1982, constituted a continuing violation of the Travel Act by defendant and the statute of limitations did not bar prosecution.

We now turn to the conspiracy count. In *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the Court discussed the applicability of the statute of limitations, then three years:

> The indictment in these cases was returned on October 25, 1954. It was therefore incumbent on the Government to prove that the conspiracy, as contemplated in the agreement as finally formulated, was still in existence on October 25, 1951, and that at least one overt act in furtherance of the conspiracy was performed after that date. For where substantiation of a conspiracy charge requires proof of an overt act, it must be shown both that the conspiracy still subsisted within the three years prior to the return of the indictment, and that at least one overt act in furtherance of the conspiratorial agreement was performed within that period. Hence, in both of these aspects, the crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy.

*Id.* at 396–97, 77 S.Ct. at 969–70 (footnotes omitted).

The indictment in the case at bar lists eleven overt acts done after October 1, 1982 (Nos. 57–67), all of which were proven beyond a reasonable doubt. The scope of the conspiracy was to bribe defendant to approve bank loans that did not meet the Bank's stated requirements. The bribes were paid in the form of a boat, money, and repairs and renovations to defendant's home.

■ In *United States v. Ibern–Maldonado*, 823 F.2d 698, 699 (1st Cir.1987), we quoted *United States v. Hamilton*, 689 F.2d 1262, 1270 (6th Cir.1982), *cert. denied*, 459 U.S. 1117, 103 S.Ct. 753, 754, 74 L.Ed.2d 971 (1983), stating, "case law gives ample support to the proposition that payment is an integral and often final term in a conspiracy." We agree with the Fifth Circuit that a conspiracy continues until the anticipated economic benefits of the defendant are realized. *United States v. Girard*, 744 F.2d 1170, 1172 (5th Cir.1984). *See also United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir.1982) ("a conspiracy

continues until the conspirators receive their payoffs").

The post-October 1, 1982 repairs and renovations to defendant's home have already been discussed. Four checks were made out between October 6 and November 10, 1982, by a fellow conspirator, Romeyn, to pay for the work. Although it is not clear that these checks were mailed or taken to New York and therefore might not have constituted a substantive violation of the Travel Act, they certainly were part of the payoff to defendant in furtherance of the conspiracy. The final nail in the conspiracy coffin is the $50,000 check made out as defendant had directed and deposited in a Panamanian account on October 1, 1982. The check did not clear the Federal Reserve Bank and the Newport Old Colony Bank until October 5, 1982, which was the effective date of payment.

We find that the statute of limitations did not bar prosecution of the conspiracy count of the indictment.

We have carefully considered the other arguments made by defendant and reject them without more as meritless.

AFFIRMED.