12-4310-cr (L)
United States v. Grimm, et al.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2013

(Argued: November 19, 2013    Decided: December 9, 2013)

Docket Nos. 12-4310-cr; 12-4365-cr; 12-4371-cr

- - - - - - - - - - - - - - - - - - - - -x

United States of America,

Appellee,

- v.-

Peter S. Grimm, Dominick P. Carollo, Steven E. Goldberg,

Defendants-Appellants,

and

UBS AG, UBS Securities LLC, UBS Financial Services, Inc.,

Intervenors.

- - - - - - - - - - - - - - - - - - - - -x

Before:        KEARSE, JACOBS and STRAUB, Circuit Judges.

Peter Grimm, Dominick Carollo, and Steven Goldberg appeal from judgments of conviction entered in the United States District Court for the Southern District of New York (Baer, J.).  We reverse on the ground that the indictment is barred by the applicable statutes of limitations.

Judge KEARSE dissents in a separate opinion.

HOWARD E. HEISS, O'Melveny & Myers LLP, New York, NY (Jonathan D. Hacker, Anton Metlitsky, Deanna M. Rice, Mark A. Racanelli, on the brief), for Appellant Grimm.

JAMES R. SMART, McElroy, Deutsch, Mulvaney & Carpenter LLP, Morristown, NJ (Walter F. Timpone, on the brief), for Appellant Carollo.

DAVID C. FREDERICK, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC (Brendan J. Crimmins, Emily T.P. Rosen, Andrew E. Goldsmith, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC; John S. Siffert, Daniel M. Gitner, Lankler Siffert & Wohl LLP, New York, NY, on the brief), for Appellant Goldberg.

JAMES J. FREDRICKS, United States Department of Justice, Washington, DC, (Scott D. Hammond, Deputy Assistant Attorney General, John J. Powers, III, Finnuala K. Tessier, United States Department of Justice, Washington, DC, Antonia R. Hill, Steven Tugander, United States Department of Justice, New York, NY, on the brief), for Appellee.

DENNIS JACOBS, Circuit Judge:

Three employees of General Electric Company ("GE") conducted a multi-year scheme to fix below-market rates on interest paid by GE to municipalities. When municipalities receive proceeds of tax-exempt bond issues, they invest those proceeds (with GE and others) until such time as the funds become needed for the underlying capital projects. To prevent abuse of municipal bonds for pure arbitrage, the Internal Revenue Code and Treasury regulations require a municipality to rebate to the Treasury any excess over the municipal bond rate. To guarantee a market rate of interest on these investments, municipalities are required to use competitive bidding. The conspiracy between GE employees and brokers depressed the interest rate on the guaranteed investment contracts paid by unindicted co-conspirator GE; each instance cheated either the municipalities or the Treasury (or both).

Steven Goldberg, Peter Grimm, and Dominick Carollo (collectively, "Defendants") were tried and convicted in the United States District Court for the Southern District of New York (Baer, J.) of violating the general federal conspiracy statute, 18 U.S.C. § 371. Goldberg was sentenced

3

principally to four years in prison, Grimm and Carollo to three.  They appeal the judgments of conviction on the ground (<u>inter alia</u>) that the indictment is barred by the applicable statutes of limitations.  The district court held that the statute of limitations continued to run during the period when GE paid the (depressed) interest to the municipalities, and that the interest payments could constitute overt acts.  We conclude that those payments do not constitute overt acts in furtherance of the conspiracy.

**I**

Under the Internal Revenue Code ("Tax Code"), interest payments on qualifying municipal bonds are exempt from federal income tax.  <u>See</u> I.R.C. § 103(a).  Often, municipal issuers ("issuers") do not expend the proceeds immediately because the projects financed by the issue may take years to construct.  To generate additional revenue before the funds are depleted, an issuer may invest in a guaranteed investment agreement or contract ("GIC") provided by a financial institution with a high credit rating ("provider").  GICs typically require periodic interest payments.  Although GICs have a fixed maturity date, the

4

issuer can usually draw down the principal--and thus terminate the GIC--at any time.[1]

To prevent arbitrage, the Tax Code limits the return that issuers can generate through GICs. See I.R.C. § 148. In general, any return in excess of the interest on the bonds must be paid to the Treasury. I.R.C. § 148(f). An issuer thereby lacks incentive to maximize interest on a GIC above a rate that equals or exceeds the interest rate paid on the bonds, and the arbitrage opportunities for a provider are obvious.

To prevent such abuses, Treasury regulations require issuers to determine for each GIC the fair market value, calculated as a function of the market interest rate, on the date of purchase. Treas. Reg. § 1.148-5(d). Market value is not easily determinable, however, because GICs are not regularly traded. So the Treasury regulations require as a safe harbor a competitive bidding process that, if followed, establishes the fair market value of the GIC for tax purposes. Treas. Reg. § 1.148-5(d)(6)(iii). Issuers hire third party brokers to solicit closed bids from at least

---

[1] There are sometimes limitations on the number of withdrawals that the issuer can make in a given period, but there is no limit on the size of withdrawals, so long as the funds are used for the underlying capital projects.

5

three providers; each provider offers an interest rate without knowing the rates offered by the other bidders; and the winning bidder certifies in writing that it had no prior opportunity to review the bids of other providers.

In 1999, Carollo, Goldberg, and Grimm worked for the unit of GE that served as a GIC provider. In 2001, Goldberg left GE and took a position at another provider, Financial Security Assurance, Inc. ("FSA"). Between August 1999 and May 2004, the Defendants (on behalf of their employers GE and FSA) agreed to pay kickbacks to three brokers--Chambers, Dunhill, Rubin & Co. ("CDR"); Investment Management Advisory Group, Inc. ("IMAGE"); and UBS PaineWebber, Inc. ("UBS")-- and the brokers obliged by rigging the bidding process in several ways. In some instances, the broker told a Defendant what others were bidding, which allowed the Defendant to lower an initial bid if it significantly exceeded the second-place bid, or to raise the bid to a level just high enough to win the contract.[2] In another case, a broker agreed to keep competitive bidders off the bid list, which allowed the Defendant to prevail with a low

---

[2] While this second practice of raising a bid does not, at first blush, appear to hurt the municipality, in practice it does - the corrupt bidder can intentionally bid low, knowing that the bid can later be raised if need be.

bid. And sometimes a broker would rig an auction by asking certain providers to submit intentionally losing bids. Depending on the fraudulent bid rate, the municipal bond rate, and the market interest rate, each deal defrauded the municipality, the Treasury, or both.

On July 27, 2010, a federal grand jury returned an indictment ("Initial Indictment") charging Carollo, Goldberg, and Grimm with ten conspiracies. A superseding indictment narrowed the charges. Six counts charged a two-object conspiracy in violation of 18 U.S.C. § 371 to defraud (i) the issuers of money and property through the use of an interstate wire, in violation of 18 U.S.C. § 1343, and (ii) the United States. Count Seven charged Carollo and Goldberg with a substantive wire fraud scheme in violation of 18 U.S.C. § 1343.

Defendants moved to dismiss the Superseding Indictment, arguing that the conspiracy and fraud charges were barred by the statute of limitations. In an August 2011 order, the district court dismissed the wire fraud charge because the government had not alleged any activity within the five-year limitations period, but declined to dismiss the conspiracy charges, holding that the alleged conspiracies continued as

7

long as unindicted co-conspirators GE and FSA made interest payments on the GICs. United States v. Carollo, et al., No. 10-cr-654 (HB), 2013 WL 3875322 at *2-3 (S.D.N.Y. Aug. 25, 2011).

After a three-week trial and three days of deliberations, a jury convicted Goldberg on four counts, Grimm on three counts, and Carollo on two counts. The district court denied Defendants' post-verdict motions, reiterating that the "conspiracy lasts . . . so long as the conspirators obtain an economic benefit through artificially suppressed payments." United States v. Carollo, et al., No. 10-cr-654 (HB), ECF No. 285 at 11 (S.D.N.Y. Nov. 20, 2012).

**II**

The applicable statutes of limitations are: five years for general conspiracy, see 18 U.S.C. § 3282(a), and six years for conspiracy to defraud the United States by violating the internal revenue laws, see 26 U.S.C. § 6531(1).[3] The Initial Indictment was returned on July 27,

---

[3] "[A] conspiracy charge require[s] (a) an agreement between two or more persons to commit [] fraud and (b) an overt act by at least one of the participants in furtherance of that agreement. See 18 U.S.C. § 371." United States v. Archer, 671 F.3d 149, 154 n.1 (2d Cir. 2011).

2010.  To satisfy the statute of limitations for general conspiracy, the government must establish that a conspirator knowingly committed at least one overt act in furtherance after July 27, 2005; to satisfy the statute of limitations for a fraud on the United States, the government must establish at least one overt act in furtherance after July 27, 2004.  See United States v. Salmonese, 352 F.3d 608, 614 (2d Cir. 2003) (citing Grunewald v. United States, 353 U.S. 391, 396-97 (1957)).

Of the fifty-five overt acts alleged in the Superseding Indictment, the only ones that involved conduct after July 27, 2004 were the periodic interest payments made by providers to issuers pursuant to the GICs: "On numerous occasions, [provider] . . . made payments to municipal issuers via interstate wire transfer at artificially determined or suppressed rates."  Superseding Indictment ¶¶ 22(f) (Count One); 30(f) (Count Two); 38(f) (Count Three); 47(f) (Count Four); 57(f) (Count Five); 64(f) (Count Six).[4]

_____

[4] Six other alleged overt acts (one per count) referenced specific interest payments.  Superseding Indictment ¶¶ 22(g)(iii) (Count One) ("Beginning in approximately July 2004, Provider B made scheduled interest payments via interstate wire transfer to the state housing agency at a rate GRIMM caused to be artificially determined and suppressed, which payments continued until approximately November 1, 2005"); 30(g)(iii) (Count Two) ("Provider B has

The Defendants argue that such interest payments cannot serve as overt acts because the routine payments were scheduled to continue for years (if not decades) after the GICs were awarded and after all concerted conduct had ended. We review this legal claim de novo.  Salmonese, 352 F.3d at 614.

"'[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines

---

made scheduled interest payments via interstate wire transmissions to the state housing and finance association at artificially determined and suppressed rates, including a payment of approximately $55,652.43 on or about June 30, 2006."); 38(g)(iii) (Count Three) ("Beginning in approximately late 2000, via interstate wire transfer, Provider B made semi-annual interest payments to a state environmental improvement and energy authority at rates that were artificially determined and suppressed, including a payment on one of the funds of approximately $35,361.20 on or about June 30, 2006."); 47(g)(iii) (Count Four) ("Provider B made scheduled payments via interstate wire transfer to a state educational assistance foundation at artificially determined and suppressed rates, including a payment of approximately $43,442.04 on or about November 1, 2006."); 57(g)(iv) (Count Five) ("Beginning approximately in May 2003, Provider A made semi-annual interest payments via interstate wire to the municipal port facility at a rate that was artificially determined, which payments continued until at least October 2006."); 64(g)(iii) (Count Six) ("On or about April 14, 2006, Provider A made, via interstate wire transfer, a payment of principal and interest of approximately $2,761,041.96 to a state educational facilities authority, which payment was artificially determined and suppressed.").

10

both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy.'" Id. (quoting Grunewald, 353 U.S. at 397). Here, the alleged purposes of the conspiracies were (1) to "deprive municipal issuers of money by causing them to award investment agreements and other municipal finance contracts at artificially determined or suppressed rates, and to deprive the municipal issuers of the property right to control their assets by causing them to make economic decisions based on false and misleading information"; and (2) to "defraud the United States . . . and the IRS by impeding . . . [the] collection of revenue due . . . from municipal issuers." Superseding Indictment ¶¶ 19-20.

In United States v. Salmonese, we held that a conspirator's receipt of anticipated profits from the sale of stripped warrants constituted an "overt act in furtherance of an economically-motivated conspiracy." 352 F.3d at 616. We explained that, "where a conspiracy's purpose is economic enrichment, the jointly undertaken scheme continues through the conspirators' receipt of 'their anticipated economic benefits.'" Id. at 615 (citing United

11

States v. Mennuti, 679 F.2d 1032, 1035 (2d Cir. 1982)).  The government relies on that passage to support its view that each successive payment of interest by an unindicted co-conspirator is another overt act.  Salmonese gets the government only so far.

Salmonese followed the analysis set out in United States v. Doherty, 867 F.2d 47 (1st Cir. 1989), and that analysis defeats the government's argument in the circumstances of the current appeal.  In Doherty, police officers conspired to obtain copies of promotional exams, and thereby increased their salary payments, which continued for years after they were increased by means of the fraud.  Doherty nevertheless held that the continuing receipt of the ill-gotten salaries did not constitute overt acts, and therefore did not re-start the limitations period.  Following Doherty, Salmonese reasoned that a conspiracy ends notwithstanding the receipt of anticipated profits "'where [] the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions . . . *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place.'"  Salmonese, 352 F.3d at 616 (citing

12

Doherty, 867 F.2d at 61) (emphasis in original). Conversely, "'payoffs' could reasonably be viewed as part of a conspiracy where their receipt 'consists of one action, or a handful of actions, taking place over a limited period of time, or where some evidence exists that the special dangers attendant to conspiracies . . . remain present until the payoff is received.'" Id. (citing Doherty, 867 F.2d at 61).

In Salmonese, the sales of the stripped warrants were counted as overt acts because they were completed within ten weeks of the public offering and were "hardly 'indefinite' in number or 'lengthy' in duration." Id. That analysis here commands the opposite result.

Doherty and Salmonese list features to describe serial payments that do not constitute overt acts: lengthy, indefinite, ordinary, typically noncriminal and unilateral. The list is descriptive rather than exclusive; but generally, overt acts have ended when the conspiracy has completed its influence on an otherwise legitimate course of common dealing that remains ongoing for a prolonged time, without measures of concealment, adjustment or any other corrupt intervention by any conspirator.

13

The GIC payments here fit that description in every particular. Payments of interest on a GIC are ordinary commercial obligations, made pursuant to a common form of commercial arrangement; they are noncriminal in themselves; they are made unilaterally by a single person or entity; and they are made indefinitely, over a long time, typically up to 20 years or more. Some are still being paid. And since the government adduced no evidence of overt acts after July 27, 2004 other than the interest payments, "there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place." Salmonese, 352 F.3d at 616 (citing Doherty, 867 F.2d at 61).

The government argues that the interest payments are not "indefinite" because each GIC has a maturity date and prescribes the number of payments to be made. The government's position must be that a conspiracy continues so long as a stream of anticipated payments contains an element of profit. But that proves too much. A conspiracy to corrupt the rent payable on a 99-year ground lease would, under the government's theory, prolong the overt acts until long after any conspirator or co-conspirator was left to profit, or to plot.

14

"Indefinite" cannot mean "without end." Even in Doherty, the salary payments lasted only as long as the officers' employment. Payments can be "indefinite" either in the sense that they are of undetermined number or in the sense that they are prolonged beyond the near future. The GIC payments are indefinite in both senses.

The interest payments continue indefinitely in the sense that they are prolonged. And the number of payments is not fixed because they end when and if:

- the issuer demands the return of all of the principal to finance the capital project;

- the GIC is assigned (with the prior written consent of the issuer); or

- the provider's credit rating falls below a specified level, at which point the issuer can terminate the GIC and withdraw the funds for any purpose, including reinvestment.

In any event, when anticipated economic benefit continues, in a regular and ordinary course, well beyond the period "when the unique threats to society posed by a conspiracy are present," the advantageous interest payment is the result of a completed conspiracy, and is not in

15

furtherance of one that is ongoing.[5]  As the Supreme Court has explained:

> Though the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one.  Continuity of action to produce the unlawful result, or . . . 'continuous co-operation of the conspirators to keep it up' is necessary.

Fiswick v. United States, 329 U.S. 211, 216 (1946) (citations omitted) (quoting United States v. Kissel, 218 U.S. 601, 607 (1910)).  The stream of GIC interest payments does not raise the underlying concern of concerted action, and therefore is not a continuous action that prolongs the life of the conspiracy.[6]

---

[5] The dissent assumes that because GE was (necessarily) found to be a co-conspirator, its acts over the full term of the contract were acts performed as a co-conspirator and were therefore "overt acts."  This argument assumes its own conclusion: characterizing GE's contractual performance over decades as "overt acts" assumes that the conspiracy continued indefinitely over that time notwithstanding that in every other respect it had run its course.

[6] As in Doherty, "the cases the government has cited . . . [are] consistent with this approach."  Doherty, 867 F.2d at 62.  Nearly every case involved either continued concerted action or a few payments over a short time period.  See, e.g., Salmonese, 352 F.3d at 614 (just over a handful of sales over a ten-week period); United States v. Mennuti, 679 F.2d 1032 (2d Cir. 1982) (single purchase of a home); United States v. A-A-A Elec. Co., 788 F.2d 242 (4th Cir. 1986) (payoffs to co-conspirators continued after award of contract); United States v. Girard, 744 F.2d 1170 (5th Cir. 1984) (last payment on one-year government contract made fewer than three months after final payoff to co-conspirators); United States v. Walker, 653 F.2d 1343

**CONCLUSION**

For the foregoing reasons, we hold that the government did not allege overt acts within the limitations period. Accordingly, we reverse the judgments of conviction, and remand to the district court for dismissal of the indictment.

---

(9th Cir. 1981) (conspirators continued to divide profits from scheme on a yearly basis).

KEARSE, Circuit Judge, dissenting:

I respectfully dissent from the majority's decision to reverse the convictions of Messrs. Grimm, Carollo, and Goldberg ("defendants") on statute-of-limitations grounds. In my view, a major flaw in the majority's opinion is its failure to acknowledge the implications of the facts that the superseding indictment ("Indictment") alleged, and that the jury was instructed that in order to convict it must find, that the corporate organizations that won the described guaranteed investment contracts ("GICs") by engaging in the bid-rigging conspiracies--which enabled them to, inter alia, pay interest to municipalities at artificially depressed rates for the duration of the GICs--were themselves coconspirators, albeit unindicted coconspirators.

At various stages of the bid rigging, all three defendants were employed by General Electric or related companies, which were referred to in the Indictment as "Provider B." The Indictment alleged that Provider B sold investment agreements and other municipal finance contracts through its business leaders and marketers, including Grimm, Carollo, and Goldberg. (See Indictment ¶ 2.) Grimm and Goldberg had authority to and did submit bids for investments and other municipal finance contracts on behalf of Provider B; Carollo was a manager and supervisor with respect to that aspect of Provider B's business. (See id. ¶¶ 3-5.) During the bid-rigging period, Goldberg left Provider B and joined Financial Security Assurance, part of a group of related financial services companies that was referred to in the Indictment as "Provider A." (See Indictment ¶¶ 50, 51.) As a vice president or director of Provider A, Goldberg "had authority to and did submit bids for investment agreement[s] or other municipal finance contracts for Provider A." (Id. ¶ 51.)

In light of the Indictment's allegations that Grimm, Carollo, and Goldberg, in engaging in bid rigging, acted on behalf of providers who were coconspirators, several well established principles of conspiracy liability compel me to conclude that the statute of limitations did not bar the prosecution of these defendants.

> [T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy.

Grunewald v. United States, 353 U.S. 391, 397 (1957) (emphases added).  In order "[t]o constitute an overt act for purposes of the statute of limitations the act must involve some affirmative conduct or deliberate omission on the part of [a defendant] or her coconspirators," United States v. Ben Zvi, 242 F.3d 89, 97 (2d Cir. 2001) ("Ben Zvi"); see, e.g., United States v. Salmonese, 352 F.3d 608, 617-18 (2d Cir. 2003) ("Salmonese").  However, "[t]he overt act, without proof of which a charge of conspiracy [under 18 U.S.C. § 371] cannot be submitted to the jury, . . . need not be itself a crime." Braverman v. United States, 317 U.S. 49, 53 (1942).

Foreseeable acts of one coconspirator in furtherance of the conspiracy are attributable to all coconspirators.  See, e.g., Pinkerton v. United States, 328 U.S. 640, 646-47 (1946); United States v. Milstein, 401 F.3d 53, 72 (2d Cir. 2005).  This principle is applicable even if the coconspirator who so acts is unindicted.  See, e.g., United States v. Grammatikos, 633 F.2d 1013, 1023 (2d Cir. 1980) (acts of unindicted coconspirators may prove continued existence of the conspiracy); see also United States v. Matthews, 168 F.3d 1234, 1246 (11th Cir.) (unindicted coconspirator's overt acts within a district in furtherance of a conspiracy suffice to establish venue in the district), cert. denied, 528 U.S. 883 (1999); United States v. Sandy, 605 F.2d 210, 215-16 (6th Cir.) (overt acts alleged and proven to have been performed by an unindicted coconspirator sufficed to connect the defendants to the conspiracy), cert. denied, 444 U.S. 984 (1979).

2

Conspiracy is "a continuing crime[] that is not complete until the purposes of the conspiracy have been accomplished or abandoned." United States v. Pizzonia, 577 F.3d 455, 466 (2d Cir. 2009) (internal quotation marks omitted), cert. denied, 558 U.S. 1115 (2010); see generally United States v. Kissel, 218 U.S. 601, 610 (1910) ("a conspiracy may have continuance in time"). "Once a conspiracy is shown to exist, which in its nature is not ended merely by lapse of time, it continues to exist until consummated, abandoned or otherwise terminated by some affirmative act." United States v. Rucker, 586 F.2d 899, 906 (2d Cir. 1978) ("Rucker").

Applying this principle, "[t]his court has consistently ruled that where a conspiracy's purpose is economic enrichment, the jointly undertaken scheme continues through the conspirators' receipt of 'their anticipated economic benefits.'" Salmonese, 352 F.3d at 615 (quoting United States v. Mennuti, 679 F.2d 1032, 1035 (2d Cir. 1982), and citing United States v. LaSpina, 299 F.3d 165, 175 (2d Cir. 2002); Ben Zvi, 242 F.3d at 98; United States v. Fletcher, 928 F.2d 495, 500 (2d Cir.), cert. denied, 502 U.S. 815 (1991); United States v. Knuckles, 581 F.2d 305, 313 (2d Cir.), cert. denied, 439 U.S. 986 (1978)); see also United States v. Azeem, 946 F.2d 13, 16 (2d Cir. 1991) ("A conspiracy continues after the occurrence of the underlying offense and is not completed until the conspirators receive their payoffs."); United States v. Fitzpatrick, 892 F.2d 162, 167 (1st Cir. 1989) ("a conspiracy continues until the anticipated economic benefits of the defendant are realized"). "[A]bsent withdrawal, a conspirator's 'participation in a conspiracy is presumed to continue until the last overt act [in furtherance of the conspiracy] by any of the conspirators.'" Salmonese, 352 F.3d at 615 (quoting United States v. Diaz, 176 F.3d 52, 98 (2d Cir.), cert. denied, 528 U.S. 875 (1999)). And "[e]very act in furtherance of the conspiracy is regarded in law as a renewal or continuance of the unlawful agreement." Rucker, 586 F.2d at 906.

In the present case, the allegations in the five counts of the Indictment on which defendants were convicted clearly delineate the scope of the conspiratorial agreements with respect

to goals, memberships, and durations. As to the conspiratorial objectives, the Indictment alleged that one of the goals of each of the conspiracies charged in Counts I, II, and IV was "to defraud municipal issuers and to obtain money and property from municipal issuers by means of false and fraudulent pretenses" (Indictment ¶¶ 19, 27, 44), "increasing . . . the . . . profitability of investment agreements and other municipal finance contracts awarded to Provider B by municipal issuers . . . through the control and manipulation of bidding for investment agreements and other municipal finance contracts" (id. ¶¶ 21(a), 29(a), 46(a) (emphases added)). Similarly, the Indictment alleged that a goal of the conspiracies charged in Counts V and VI was to increase the profitability of such contracts for Provider A. (See, e.g., id. ¶¶ 56(a), 63(a).)

As to membership in the conspiracies, Counts I and II of the Indictment alleged that all three defendants' "co-conspirators[] includ[ed] Provider B" (Indictment Count I, ¶¶ 18, 19, 20, 22; id. Count II ¶¶ 26, 27, 28, 30); and Count IV alleged that Grimm's "co-conspirators[] includ[ed] Provider B" (Indictment ¶¶ 43, 44, 45, 47). Counts V and VI likewise alleged that Goldberg's "co-conspirators[] includ[ed] Provider A." (Indictment Count V, ¶¶ 53, 54, 55, 57; id. Count VI, ¶¶ 60, 61, 62, 64.)

As to duration, the Indictment alleged that length of the investment agreements of the type that were subjected to bid rigging here varies from "as short as one month to as long as thirty years." (Indictment ¶ 10.) To the extent that the providers sought to enjoy the difference between a fairly arrived-at market rate of interest and the fraudulently arrived-at rate of interest to which the municipalities agreed as a result of the bid rigging, the providers would realize economic gains each time they made an interest payment to the municipal entity at the lower rate. See, e.g., United States v. Walker, 653 F.2d 1343, 1347 (9th Cir. 1981) (finding injury to victim of rigged contract with each of the defendant's payments at a "noncompetitive price"), cert. denied, 455 U.S. 908 (1982).

4

With respect to overt acts in furtherance of the conspiracies, Counts I, II, and IV alleged, <u>inter alia</u>, that, Provider B made its payments on the GICs to the relevant municipal entities "at artificially determined [and/or] suppressed rates." (Indictment Count 1, ¶ 22(f); <u>id</u>. Count II, ¶¶ 30(f), 30(g)(iii)); <u>id</u>. Count IV, ¶¶ 47(f), 47(g)(iii).) Provider B was alleged to have continued to make such payments at least until approximately November 1, 2005 (Indictment Count I, ¶ 22(g)(iii)), June 30, 2006 (<u>id</u>. Count II, ¶ 30(g)(iii)), and November 1, 2006 (<u>id</u>. Count IV, ¶ 47(g)(iii)). Counts V and VI similarly alleged that Provider A made payments on the relevant contracts at interest rates that were artificially determined, and that those payments continued at least until October 2006 (Indictment Count V, ¶ 57(g)(iv)), and April 2006 (<u>id</u>. Count VI, ¶ 64(g)(iii)). All of these dates were within the five-year limitations period that ended with the return of the original indictment in this case on July 27, 2010.

Whether the allegations in the Indictment were proven--including whether the unindicted corporate organizations, Providers A and B, were coconspirators--was of course a matter for the jury. "A corporation can act only through its agents, and the acts of individuals on the corporation's behalf may be properly chargeable to it." <u>United States v. Paccione</u>, 949 F.2d 1183, 1200 (2d Cir. 1991) (internal quotation marks omitted), <u>cert. denied</u>, 505 U.S. 1220 (1992).

The jury here was instructed that "the government must prove that there was a mutual agreement among the defendant under consideration and at least one other person, <u>together with the respective corporate provider</u> and the broker that they represent, <u>to cooperate with each other to accomplish the objectives of each charged conspiracy</u>." (Trial Transcript ("Tr.") 3222 (emphases added); <u>see also id</u>. at 3223 ("Ultimately, you must ask yourself if the government has proved beyond a reasonable doubt the conspirators in the count you are considering, <u>acting on behalf of the named corporate provider</u> and broker, came to an understanding to violate the law and to accomplish the unlawful objectives of the alleged conspiracy." (emphasis added)).)

5

In finding defendants guilty on the five counts under consideration, the jury necessarily found that Provider B conspired with the defendants charged in Counts I, II, and IV, and that Provider A conspired with the defendant charged in Counts V and VI. Defendants have not challenged the sufficiency of the evidence to support such findings, and I see no basis for such a challenge.

Whether an act by a coconspirator is in furtherance of the conspiracy is likewise a factual question to be determined by the jury. See, e.g., Nye & Nissen v. United States, 336 U.S. 613, 618 (1949); United States v. Bruno, 873 F.2d 555, 560 (2d Cir.), cert. denied, 493 U.S. 840 (1989). The jury here was instructed that "[a]n overt act was 'in furtherance' of a conspiracy if the act was undertaken in order to advance an objective of the conspiracy." (Tr. 3235 (emphasis added).) It was also instructed that, in order to convict, it must find "that at least one object of each conspiracy existed at some point in time, within the period alleged in each of the counts." (Tr. 3224.)

In my view, it was permissible for the jury to find that (a) an objective of the conspiracies was, as alleged, to enable the providers to make their periodic interest payments at artificially suppressed rates, and (b) that objective existed within the limitations period. It was also permissible for the jury to find that all of the providers' interest payments were acts in furtherance of the conspiracies. Indeed, the payments were essential to the conspiracies' success: If the payments were not made, the providers would be in breach of the investment contracts and would cease to achieve their conspiratorial goals of economic gain through payments of interest below fair market rates.

The majority's conclusion that the statute of limitations bars this prosecution is flawed, in my view, not only because of its disregard of the roles of Providers A and B as coconspirators but also because of its misinterpretation of this Court's prior rulings and its reliance on inappropriate factors. For example, the majority points out that many of the investment contracts at issue are to be performed "over a long time, typically up to 20 years or more." (Majority opinion ante at 14.) But

6

"the duration of the conspiracy" is "determine[d]" by "the scope of the conspiratorial agreement," Grunewald, 353 U.S. at 397; and here the precise goals of the conspiratorial agreements were to have long-term contracts awarded to Providers A and B, during which the providers would repeatedly make interest payments at artificially depressed rates, and thereby repeatedly reap the desired economic gains. The majority also states that the providers are making payments that are "noncriminal in themselves." (Majority opinion ante at 14.) But an overt act "need not be itself a crime." Braverman, 317 U.S. at 53. The majority further states that there was no evidence of "concerted activity" within the limitations period. (Majority opinion ante at 14.) But foreseeable overt acts by one coconspirator in furtherance of the conspiracy are attributable to all coconspirators. See, e.g., Pinkerton, 328 U.S. at 646-47. "[A] conspiracy is a partnership in crime; and an 'overt act of one partner may be the act of all without any new agreement specifically directed to that act.'" United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253-54 (1940) (quoting Kissel, 218 U.S. at 608).

The majority also, in my view, misinterprets the opinion of this Court in Salmonese as adopting the decision of the First Circuit in United States v. Doherty, 867 F.2d 47 (2d Cir. 1989), which found a certain conspiracy count time-barred where the only acts within the limitations period were the defendant's receipt of higher salary payments as a result of a promotion following his unlawful advance acquisition of test questions. The Doherty court concluded that the statute of limitations barred the count in question because the defendant's "receipt of salary is a 'result' of, not an act in furtherance of, the conspiracy," 867 F.2d at 62, and that the indefinite duration of such salary payments raised the specter of "extending the conspiracy statute of limitations indefinitely beyond the period when the unique threats to society posed by a conspiracy are present," id. The majority describes Salmonese as stating that the statute of limitations has run where

> "there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place." Salmonese, 352 F.3d at 616 (citing Doherty, 867 F.2d at 61).

7

(Majority opinion ante at 14.) I have several problems with this interpretation.

To begin with, Salmonese was in fact quoting Doherty for purposes of discussion, rather than citing it as authority for the resolution of the Salmonese appeal. The next sentence in Salmonese began: "Were this court to follow Doherty, [the defendant] would not benefit . . . ." Salmonese, 352 F.3d at 616 (emphasis added).

Thus, Salmonese, unlike Doherty, affirmed the defendant's conviction and rejected his statute-of-limitations defense. The fact that Salmonese affirmed as to a conspiracy that came to a natural end after a limited period of time provides no authority for the proposition that the conspiracy in the present case must be deemed to have ended after a similarly limited period. Here, the coconspirators agreed to engage in bid rigging in order to secure for Providers A and B, respectively, lengthy contracts that would give the provider an economic gain each time it made an interest payment at the artificially depressed rate. The defendants thus entered into conspiracies that were not completed with the awards of the rigged contracts.

Further, although the majority quotes Fiswick v. United States, 329 U.S. 211, 216 (1946), as supporting its view that "the advantageous interest payment" in this case "is the result of a completed conspiracy, and is not in furtherance of one that is ongoing" (majority opinion ante at 15-16 (emphasis in original)), the majority miscasts the "result" of the bid-rigging conspiracy and ignores part of Fiswick's quoted language. The Fiswick Court stated that what is necessary for a conspiracy to "become a continuing one" is "[c]ontinuity of action to produce the unlawful result, **or** . . . 'continuous cooperation of the conspirators to keep it up.'" 329 U.S. at 216 (emphasis added). These are alternative ways in which a conspiracy may be continued; a conspiracy may be one that is "continuing" if there is simply a "[c]ontinuity of action to produce the unlawful result," id. And in this case I think it clear that continuity of action was present--and indeed was essential to the scheme. The "result" of the bid rigging is not, as the majority states, the providers' "payments"; the result is

8

the artificially arrived-at interest rate that gives the providers an economic gain each time a payment is made. Periodic payments must be made by the providers in order to realize the desired economic benefit from their advantageous interest-rate differential. Thus, continuity of action after the awards of these rigged contracts was integral to the success of the conspiracies.

Finally, the majority's view that in this case there is no evidence of any continued concerted activity posing the special societal dangers of society (see, e.g., majority opinion ante at 16 ("[t]he stream of GIC interest payments does not raise the underlying concern of concerted action")) seems to me misguided. The policies underlying punishment of conspiracies include recognition that "[c]oncerted action . . . increases the likelihood that the criminal object will be successfully attained," and that "[g]roup association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish." Callanan v. United States, 364 U.S. 587, 593 (1967). Those policies should be of concern here. The bid rigging made it possible for the provider coconspirators to win contracts that would enable them to pay interest to the municipalities at substandard rates--something no single bidder could accomplish alone--and allowed the coconspirators to succeed in a scheme sufficiently complex to allow various coconspirators to enjoy their illegal gains at different times and for prolonged periods.

In sum, my view is that where a conspiracy is specifically designed to enable some of the coconspirators to win contracts that will provide them with economic gains repeatedly over the life of the contract by allowing them to make periodic interest payments at artificially low rates, the conspiracy ordinarily does not end--and each of the conspiracies at issue here did not end--before the contracting coconspirator's last payment pursuant to the contract.

Accordingly, I dissent from the decision that the present prosecution was barred by the statute of limitations.

9